LISA DANIELSON, complainant-appellant,

*v.*

DANIEL A. DANIELSON, defendant-respondent.

[Submitted October term, 1939.  Decided February 5th, 1940.]

*Messrs. Rospond & Rospond (Mr. J. Thaddeus Rospond,* of counsel), for the complainant-appellant.

*Mr. Albert L. Vreeland,* for the defendant-respondent.

PER CURIAM.

The present appeal is from a decree of the court of chancery in a matrimonial case. The wife filed a bill for separate maintenance. The husband counter-claimed for a divorce on the ground of desertion and later, by amendment to his counter-claim, charged his wife with adultery. The court dismissed the wife's bill for separate maintenance on the merits. In this we concur. The husband's counter-claim charging desertion was abandoned; but the court concluded that the wife's adultery was proved and advised a decree in favor of the husband based thereon. That the wife's conduct, as we regard the testimony, was unseemly in the extreme we have no doubt. She struck up a fortuitous friendship with one Robert H. Hooton, a married man, although the fact that he was married was probably not known to her. He visited the appellant, Mrs. Danielson, at her home (she was living apart from her husband) which is located in a semi-business district, over a cigar store in the city of Montclair. It is not denied that Hooton visited her there and that she went out with him to moving pictures and the like. The husband's claim is that these parties were guilty of conduct which justified the conclusion that their relations were adulterous on April 9th, 16th and 23d, in 1937. There is no proof of adultery on April 9th or 16th, but the husband contends that on April 23d, the evidence supports the court's finding in this respect. The husband and his witnesses were watching the wife's apartment from a garage across the way. On that night the wife was entertaining two women friends and Hooton. The testimony is that they spent the evening playing cards and that at about eleven o'clock the two women visitors left and Hooton volunteered to take them home in his automobile. Mrs. Danielson went along. That mission was accomplished in half an hour or less. Mrs. Danielson and Hooton returned to her apartment because, as they testified, he wanted to have a cup of coffee.

Witnesses for the husband, viz., himself, one Kessler, a special officer of the East Orange police department, one Stevens, a police mechanic of the East Orange police department, and one Eckstrom, a friend of the Danielsons, made up

the party who watched the apartment on the night in question. They said that on the return of Mrs. Danielson and Hooton they saw them kissing each other and that the appellant sat on Hooton's lap. Kessler says the lights were "turned dim" at first and later were turned out. The husband said that the kitchen light was on but there was no light in the living room, but that because of the light in the kitchen, in back of the living room where Mrs. Danielson and Hooton were, everything could clearly be seen. Within a very short time—we take it from the testimony, about fifteen minutes— these witnesses entered Mrs. Danielson's apartment. Incidentally, the raiding party mistakenly broke into another apartment first before entering the one they were seeking.

The wife's testimony as to the lights in her home is that there was a very dim light in the living room and but two candles burning in the kitchen. She is compelled to wear dark glasses and is unable to stand the glare of strong light. That she has weak eyes is not denied.

When the apartment was entered Hooton was at the radio, as he says, trying to get a certain station. His coat was off. Mrs. Danielson came from the kitchen. The raid, so far as supplying proof in support of the husband's counter-claim is concerned, was a failure. No witness on this phase of the case testified to any fact or circumstance that was incriminating. The husband described his wife's appearance at the time of his raid as "nothing unusual;" that there was nothing suspicious about the appearance of Hooton at the time, "just a little scared;" and that there was nothing after he broke into the house to lead him to believe that his wife and Hooton were having an "illicit love affair."

Kessler said that at the time he entered the apartment he found nothing to arouse his suspicions except for the fact that Mr. Hooton had his coat off which this witness thought was an "irregularity." The witness, Stevens, testified to nothing "incriminating." The witness, Eckstrom, testified when he entered the apartment that he found "no evidence of wrongdoing there."

The learned advisory master, at the end of the case, acquiesced in the application of the wife that the premises

be inspected from the garage property across the way from which Mrs. Danielson lived, to ascertain whether the observations of the witness who had watched the place, were trustworthy. The order in the matter recited that an inspection of the premises would be made "for the purpose of ascertaining whether or not the actions of persons within that apartment [Mrs. Danielson's] can be discerned from the garage building on the opposite side of the street * * *." A special master of the court of chancery was appointed to inspect and report. His report said that from the garage he could not see a person sitting in the armchair in the apartment. His inspection was made from the point of vantage that had been occupied by the witness, Kessler, on April 23d. It was prearranged that counsel in the case should sit in the chair inside the apartment, the location of the chair being first designated by the witness, Kessler. The master made his observations from across the way, while there were varying degrees of light in the kitchen, and he reported that he could not see the subject in the armchair as placed by Kessler nor what the subject was doing. Notwithstanding this, the advisory master found that he was not satisfied "that the physical condition of the furniture on the premises was the same" on the night of the test as it was on April 23d, 1937, the night of the raid. We perceive no reasonable justification for his conclusion especially in view of the fact that the armchair in question was placed, at the time of the inspection, in the location designated by the said Kessler.

This appeal concerns a fact issue. We have examined the facts with care, having in mind the rule that the evidence, where circumstantial, as here, must be such that there is a decided preponderance to support the charge and that it must be of the character to satisfy the mind and leave the careful and guarded judgment of the court free from conscientious perplexing doubts as to whether the charge was proved. See *Berckmans* v. *Berckmans, 17 N. J. Eq. 453, 454.*

After a careful survey of the evidence of those who made up the group of witnesses testifying to the happenings on the night of April 23d, and all the other testimony in the case, we incline to the view that the proof is not convincing

and that the appellant wife is entitled to the benefit of our doubt. Adultery may be proved by convincing evidence of inclination and opportunity. The evidence to support the former, to our mind, is not convincing and the latter, not looking beyond the testimony of the husband's own witnesses, was not proved.

The decree in favor of the husband will be reversed.

*For affirmance*—TRENCHARD, HETFIELD, JJ. 2.

*For reversal*—THE CHIEF-JUSTICE, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, DEAR, WELLS, WOLFSKEIL, RAFFERTY, HAGUE, JJ. 12.